**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 8, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

BOARD OF COUNTY
COMMISSIONERS OF BOULDER
COUNTY; BOARD OF COUNTY
COMMISSIONERS OF SAN MIGUEL
COUNTY; CITY OF BOULDER,

    Plaintiffs - Appellees,

v.

SUNCOR ENERGY (U.S.A.) INC.;
SUNCOR ENERGY SALES INC.;
SUNCOR ENERGY INC.; EXXON
MOBIL CORPORATION,

    Defendants - Appellants.

------------------------------
CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA;
COLORADO COMMUNITIES FOR
CLIMATE ACTION; THE NATIONAL
LEAGUE OF CITIES; THE U.S.
CONFERENCE OF MAYORS; THE
INTERNATIONAL MUNICIPAL
LAWYERS ASSOCIATION; NATURAL
RESOURCES DEFENSE COUNCIL;
PUBLIC CITIZEN, INC.,

    Amici Curiae.

No. 19-1330

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:18-CV-01672-WJM-SKC)**

_____

Kannon K. Shanmugam, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, D.C. (William T. Marks, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, D.C.; Theodore V. Wells, Jr., Daniel J. Toal, Jaren Janghorbani, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York; Colin G. Harris, Faegre Baker Daniels LLP, Boulder, Colorado; and Hugh Quan Gottschalk, Evan B. Stephenson, Wheeler Trigg O'Donnell LLP, Denver, Colorado, with him on the briefs), for Defendants – Appellants.

Richard Herz, EarthRights International, Washington, D.C. (Marco Simons, Sean Powers, Michelle Harrison, EarthRights International, Washington, D.C.; David G. Bookbinder, Niskanen Center, Washington, D.C.; and Kevin S. Hannon, The Hannon Law Firm, Denver, Colorado, with him on the brief), for Plaintiff – Appellee.

Peter D. Keisler, C. Frederick Beckner III, and Ryan C. Morris, Sidley Austin LLP, Washington, D.C., filed an amicus brief on behalf of Chamber of Commerce of the United States of America.

W. Eric Pilsk, Sarah M. Keane, Sara V. Mogharabi, and Samantha R. Caravello, Kaplan Kirsch & Rockwell LLP, Denver, Colorado, filed an amicus brief on behalf of Colorado Communities for Climate Action.

Robert S. Peck, Center for Constitutional Litigation, P.C., Washington, D.C., filed an amicus brief on behalf of the National League of Cities, the United States Conference of Mayors, and the International Municipal Lawyers Association.

Peter Huffman, Natural Resources Defense Council, Washington, D.C., filed an amicus brief on behalf of the Natural Resources Defense Council.

Scott L. Nelson and Allison M. Zieve, Public Citizen Litigation Group, Washington, D.C., filed an amicus brief on behalf of Public Citizen.

_____

Before **HOLMES**, **LUCERO**, and **McHUGH**, Circuit Judges.

_____

**McHUGH**, Circuit Judge.

_____

This matter is before us on remand from the United States Supreme Court. *Suncor Energy (U.S.A.) Inc. v. Bd. of Cnty. Comm'rs of Boulder Cnty.*, 141 S. Ct. 2667 (2021)

(Mem.). The case originally came to us as an appeal of the district court's order remanding the action to state court. Pursuant to 28 U.S.C. § 1447(d), orders remanding removed cases to state court are not appealable "except that an order remanding a case to the State court from which it was removed pursuant to section 1442 [federal officer removal] or 1443 [civil rights cases] of this title shall be reviewable by appeal or otherwise." In our prior decision, we held § 1447(d) limited our appellate jurisdiction to review of only the federal officer basis for removal, which was one of six grounds of federal subject-matter jurisdiction advanced in support of removal on appeal. *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 965 F.3d 792, 819 (10th Cir. 2020), *vacated and remanded by* 141 S. Ct. 2667 (2021) (Mem.).

In *BP P.L.C. v. Mayor & City Council of Baltimore*, the Supreme Court rejected that position, holding that when a removal action is appealed under the limited grounds listed in 28 U.S.C. § 1447(d), the appellate court has subject-matter jurisdiction over all grounds for removal addressed in the district court's order. 141 S. Ct. 1532, 1543 (2021). The Court then granted certiorari in this case, vacated our prior decision, and remanded for further consideration in light of its decision in *BP v. Mayor & City Council of Baltimore. Suncor Energy (U.S.A.) Inc. v. Bd. of Cnty. Comm'rs of Boulder Cnty.*, 141 S. Ct. 2667 (2021) (Mem.).

We undertake that further consideration now. For the following reasons, we hold that none of the six grounds asserted support federal removal jurisdiction. Accordingly, we affirm the district court's order remanding the action to state court.

3

## I.    BACKGROUND

### A.    *Factual History*

**1. The Energy Companies and Climate Change[1]**

Stated broadly, this is a lawsuit about damages related to climate change. The Board of County Commissioners of Boulder County, the Board of County Commissioners of San Miguel County, and the City of Boulder (collectively, the "Municipalities") say they have experienced and will continue to experience harm because of climate change caused by fossil-fuel consumption and rising levels of carbon dioxide in the atmosphere. They also allege they have spent and will continue spending millions of dollars to mitigate this harm.

The Municipalities contend that Suncor Energy (U.S.A.) Inc., Suncor Energy Sales, Inc., Suncor Energy, Inc., and ExxonMobil Corporation ("Exxon") (collectively, the "Energy Companies") have contributed significantly to the changing climate in Colorado by producing, marketing, and selling fossil fuels. And the Municipalities allege the Energy Companies have continued their fossil-fuel activities even though they knew these activities would change the climate dramatically. The Municipalities further allege the Energy Companies concealed and/or misrepresented the dangers associated with the burning of fossil fuels despite having been aware of those dangers for decades.

---

[1] When courts review a notice of removal for jurisdiction, they may consider the complaint as well as documents attached to the notice of removal. *See McPhail v. Deere & Co.*, 529 F.3d 947, 955–56 (10th Cir. 2008). Thus, we take these facts from the Amended Complaint and the other documents attached to the Notice of Appeal.

4

**2. Exxon's Outer Continental Shelf Leases**

On appeal, the Energy Companies contend there is federal jurisdiction over the Municipalities' claims, in part, because Exxon and/or its affiliated companies have leased and continue to lease portions of the outer continental shelf of the United States ("OCS") pursuant to the Outer Continental Shelf Lands Act ("OCSLA") to extract fossil fuels. Accordingly, we include relevant background information about the OCS leases.

The OCS "is a vast underwater expanse" that begins several miles off the coastline and extends seaward for roughly two hundred miles. *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 592 (D.C. Cir. 2015). The "subsoil and seabed" of the OCS "appertain to the United States and are subject to its jurisdiction and control." 43 U.S.C. § 1331(a). "Billions of barrels of oil and trillions of cubic feet of natural gas lie beneath the OCS." *Jewell*, 779 F.3d at 592.

Pursuant to the OCSLA, the Department of Interior ("DOI") administers a federal leasing program to develop and make use of the OCS's oil and gas resources. *See* 43 U.S.C. §§ 1334–1356b. The Interior Secretary "is authorized to grant to the highest responsible qualified bidder or bidders by competitive bidding . . . any oil and gas lease" on these submerged lands. 43 U.S.C. § 1337(a)(1). For decades, Exxon has participated in this competitive leasing program, and it continues to conduct operations under OCS leases.

By the terms of its OCS leases, Exxon is required to conduct drilling "in accordance with" federally approved exploration, development, and production plans and conditions. App. at 64 § 9. These plans must "conform to sound conservation practices to

5

preserve, protect, and develop minerals resources and maximize the ultimate recovery of hydrocarbons from the leased area." *Id.* § 10. Exxon is obligated to "exercise diligence in the development of the leased area and in the production of wells located thereon;" "prevent unnecessary damage to, loss of, or waste of leased resources;" and "comply with all applicable laws, regulations and orders related to diligence, sound conservation practices and prevention of waste." *Id.* Earlier OCS leases further provided, "[a]fter due notice in writing, the Lessee shall drill such wells and produce at such rates as the Lessor may require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles." *Id.* at 50 § 10. That provision is not included in the current leases.

The leases provide DOI officials reserve the right to obtain "prompt access" to facilities and records of private OCS lessees for the purpose of federal safety, health, or environmental inspections. *Id.* at 64 § 12. The government reserves a right of first refusal to purchase all materials "[i]n time of war or when the President of the United States shall so prescribe." *Id.* at 68 § 15(d). The government also requires that 20% of all crude or natural gas produced pursuant to drilling leases be offered "to small or independent refiners." *Id.* § 15(c).

### B.    *Procedural History*

#### 1.  The Claims

In this action, the Municipalities sue for damages allegedly caused by climate change. They assert a variety of claims under Colorado law, both common law and statutory, against the Energy Companies. Specifically, the Municipalities allege claims of

6

public nuisance; private nuisance; trespass; unjust enrichment; violation of the Colorado

Consumer Protection Act, Colo. Rev. Stat. § 6-1-105(1), *et seq.*; and civil conspiracy.

They do not allege any federal claims.

The Municipalities seek compensatory damages, remediation and/or abatement,

treble damages, and costs and attorney fees. The Municipalities also ask that the Energy

Companies be held jointly liable under Colorado Revised Statutes § 13-21-111.5(4) for

"consciously conspir[ing] and deliberately pursu[ing] a common plan to commit tortious

acts." *Id.* at 194–95 The Municipalities expressly do *not* seek to interfere with or impose

liability based on the Energy Companies' speech; to "enjoin any oil and gas operations or

sales in the State of Colorado, or elsewhere, or to enforce emissions controls of any

kind;" to recover "damages or abatement relief for injuries to or occurring on federal

lands;" or to impose liability based on any act potentially deemed lobbying or petitioning.

*Id.* at 193. That is, the Municipalities do not ask the court "to stop or regulate" fossil-fuel

production or emissions "in Colorado or elsewhere." *Id.* at 74. They instead request that

the Energy Companies "help remediate the harm caused by their intentional, reckless and

negligent conduct, specifically by paying their share of the costs [the Municipalities]

have incurred and will incur because of [the Energy Companies'] contribution to

alteration of the climate." *Id.*

**2. The Notice of Removal and the District Court's Remand Order**

After the Municipalities filed their Amended Complaint in Colorado state court,

the Energy Companies filed a Notice of Removal in the United States District Court for

the District of Colorado. In that Notice, they asserted seven grounds for removal. Five of

those grounds were under the general removal statute, 28 U.S.C. § 1441(a), allowing for removal of "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." Specifically, the Energy Companies contended that 28 U.S.C. § 1331 conferred original jurisdiction over the claims because (1) the Municipalities' claims arose only under federal common law; (2) the Clean Air Act ("CAA") completely preempted the state-law claims; (3) the claims implicated disputed and substantial "federal issues" under *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005); (4) the claims arose from incidents that occurred in federal enclaves within the Municipalities' borders; and (5) original federal jurisdiction exists under the OCSLA. In addition, the Energy Companies asserted original federal jurisdiction was available under (6) the federal officer removal statute, 28 U.S.C. § 1442(a), and (7) the bankruptcy removal statute, 28 U.S.C. § 1452(a).

The Municipalities timely filed a Motion to Remand pursuant to 28 U.S.C. § 1447(c). In a detailed opinion, the district court rejected all asserted grounds for removal and remanded the action to state court.

**3.  The Appeal**

The Energy Companies appealed the district court's remand order on six grounds, including the federal officer removal statute, 28 U.S.C. § 1442, pursuant to 28 U.S.C. § 1447(d). They argued that appealing the remand order under the federal officer removal statute gave this court jurisdiction to consider all the grounds for removal asserted, not just federal officer removal. On plenary review, we disagreed and held that our jurisdiction was limited to the federal officer removal question. *Suncor Energy*, 965 F.3d

at 819. Concluding that the requirements for federal officer removal had not been satisfied, we affirmed the district court's remand order without considering the other grounds for removal. *Id.* at 827.

The Supreme Court has now clarified that in circumstances such as the present, where federal officer removal is one of multiple grounds for removal, the entire order of remand is reviewable on appeal. *BP v. Mayor & City Council of Balt.*, 141 S. Ct. at 1543. Thus, our jurisdiction extends beyond the federal officer removal statute to all grounds advanced for federal jurisdiction over the action. The Court vacated our opinion and remanded to us for reconsideration. *See Suncor Energy*, 141 S. Ct. at 2667.

On remand from the Supreme Court, we requested supplemental briefing from the parties. The Municipalities seek affirmance of the district court's decision remanding the action to Colorado state court, and the Energy Companies again claim removal is proper.

## II.    DISCUSSION

On appeal, the Energy Companies challenge the district court's remand order, relying on six grounds for federal jurisdiction under § 1442, the federal officer removal statute, and § 1441, the general removal statute. Under § 1442, the Energy Companies contend Exxon acted under a federal officer, which establishes (1) federal officer removal. And under § 1441, they contend there is original federal jurisdiction over the Municipalities' claims because (2) the claims arise under federal common law; (3) the CAA completely preempts the Municipalities' state-law claims; (4) the claims necessarily raise substantial federal issues; (5) there is federal enclave jurisdiction; and (6) the OCSLA establishes original federal jurisdiction over these claims.

We begin our analysis with a discussion of the relevant standard of review. Then, we discuss the merits of each proposed basis of federal subject-matter jurisdiction. Ultimately, we conclude the district court correctly rejected each ground, and we affirm the district court's remand order.

### A.    Standard of Review

"Only state-court actions that originally could have been filed in federal court may be removed to federal court by the defendant." *Caterpillar Inc. v. Williams,* 482 U.S. 386, 392 (1987). "'Federal courts are courts of limited jurisdiction.'" *Gunn v. Minton,* 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). So "there is a presumption against our jurisdiction." *Merida Delgado v. Gonzales*, 428 F.3d 916, 919 (10th Cir. 2005) (quotation marks omitted).

The presumption against jurisdiction is manifested in "the deeply felt and traditional reluctance of th[e Supreme] Court to expand the jurisdiction of the federal courts through a broad reading of jurisdictional statutes." *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 379 (1959), *superseded on other grounds by statute*, The Jones Act, 45 U.S.C. § 59, *as recognized in* Miles v. Apex Marine Corp., 498 U.S. 19 (1990). Thus, "statutes conferring jurisdiction on federal courts are to be strictly construed, and doubts resolved against federal jurisdiction." *United States ex rel. King v. Hillcrest Health Ctr., Inc.*, 264 F.3d 1271, 1280 (10th Cir. 2001) (quotation marks omitted). The Energy Companies, as the parties removing to federal court, bear the burden of establishing jurisdiction by a preponderance of the evidence. *Dutcher v. Matheson*, 733 F.3d 980, 985 (10th Cir. 2013).

"We review the district court's ruling on the propriety of removal de novo."

*Frederick v. Hartford Underwriters Ins. Co.*, 683 F.3d 1242, 1245 (10th Cir. 2012). We

also apply de novo review to questions of federal subject-matter jurisdiction. *Navajo*

*Nation v. Dalley*, 896 F.3d 1196, 1203 (10th Cir. 2018).

### B.    *Grounds Asserted for Federal Jurisdiction*

In our prior decision, we rejected the Energy Companies' reliance on § 1442, the

federal officer removal statute. *Suncor Energy*, 965 F.3d at 819–27. Because the Supreme

Court vacated our prior decision, we again consider that issue here. Then, we address

each of the other grounds advanced for federal subject-matter jurisdiction, including a

discussion of the district court's ruling on each issue.

### 1.  28 U.S.C. § 1442(a): Federal Officer Removal Jurisdiction

The Energy Companies argue there is federal jurisdiction and this action is

removable because Exxon acted under a federal officer pursuant to its OCS leases.[2] The

district court held that any control exercised by federal officers over Exxon's operations

through the issuance of government leases to develop fossil fuels on the OCS was

insufficient to trigger federal jurisdiction under § 1442. We agree.

The federal officer removal statute permits removal of a state court civil action

"that is against or directed to . . . any officer (or any person acting under that officer) of

---

[2] Exxon is the only party that allegedly acted under a federal officer. Section 1442, however, allows for independent removal of an entire case by "only one of several named defendants." *Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998). Thus, if Exxon can show it acted under a federal officer such that this case is removable under § 1442, the entire case is removable.

the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). The statute's "'basic purpose' is to protect against the interference with federal operations that would ensue if a state were able to arrest federal officers and agents acting within the scope of their authority and bring them to trial in a state court for an alleged state-law offense." *Mayor & City Council of Balt. v. BP P.L.C. (Baltimore II)*, 952 F.3d 452, 461 (4th Cir. 2020) (quoting *Watson v. Phillip Morris Cos., Inc.*, 551 U.S. 142, 150 (2007)), *vacated and remanded on other grounds by* 141 S. Ct. 1532 (2021).[3] Unlike other removal statutes, it should "be liberally construed to give full effect to th[at] purpose[]." *Colorado v. Symes*, 286 U.S. 510, 517 (1932).

Section 1442(a)(1) removal can apply to private persons "who lawfully assist" federal officers "in the performance of [their] official dut[ies]," *Davis v. South Carolina*, 107 U.S. 597, 600 (1883), meaning the private person must be "'authorized to act with or for [federal officers or agents] in affirmatively executing duties under . . . federal law,'" *Watson*, 551 U.S. at 151 (alterations in original) (quoting *City of Greenwood v. Peacock*, 384 U.S. 808, 824 (1966)). And § 1442(a)(1) also allows removal by private corporations. *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 135–36 (2d Cir. 2008). In either case, private defendants may remove under § 1442(a)(1) if they can show (1) they acted under the direction of a federal officer, (2) the claim has a connection or association with

---

[3] This is the appellate court's decision reviewing *Mayor & City Council of Balt. v. BP, P.L.C. (Baltimore I)*, 388 F. Supp. 3d 538, 565 (D. Md. 2019), *aff'd in part by* 952 F.3d 452 (4th Cir. 2020), which we cite later in this opinion. Because other cases we cite also name BP P.L.C. as a party, we distinguish these two cases by referring to the district court's opinion as *Baltimore I* and the appellate court's opinion as *Baltimore II*.

government-directed conduct, and (3) they have a colorable federal defense to the claim or claims. 28 U.S.C. § 1442(a)(1); *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 296 (5th Cir. 2020); *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 254 (4th Cir. 2017); *see also Greene v. Citigroup, Inc.*, No. 99-1030, 2000 WL 647190, at *2 (10th Cir. May 19, 2000) (unpublished) (applying a similar three-part test for federal officer removal jurisdiction). Exxon has failed to establish the first element of federal officer removal jurisdiction.

"The statutory phrase 'acting under' describes 'the triggering relationship between a private entity and a federal officer.'" *Baltimore II*, 952 F.3d at 462 (quoting *Watson*, 551 U.S. at 149). "The words 'acting under' are broad," but "not limitless." *Watson*, 551 U.S. at 147. In this context, "under" describes a relationship between private entity and federal superior typically involving "'subjection, guidance, or control.'" *Id.* at 151 (quoting WEBSTER'S NEW INTERNATIONAL DICTIONARY 2765 (2d ed. 1953)). Thus, a "private person's 'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id.* at 152. This "help or assistance necessary to bring a private person within the scope of the statute does *not* include simply *complying* with the law[] . . . , even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored." *Id.* at 152–53. Rather, "there must exist a 'special relationship' between" the private firm and the federal superior. *Isaacson*, 517 F.3d at 137 (quoting *Watson*, 551 U.S. at 157).

In *Watson*, "the Court considered whether the Philip Morris Companies were 'acting under' a federal officer or agency when they tested and advertised their cigarettes

13

in compliance with the Federal Trade Commission's [("FTC")] detailed regulations." *Id.* at 136. The defendants highlighted various lower court cases holding that government contractors could invoke § 1442 removal "at least when the relationship between the contractor and the [g]overnment is an unusually close one involving detailed regulation, monitoring, or supervision." *Watson*, 551 U.S. at 153. The Court unanimously rejected this attempt to equate the sufficiency of "close supervision" over private contractors to "intense regulation" of firms who are not operating under a governmental contract. *Id.* The Court explained, "the private contractor [that is subject to sufficiently close supervision] is helping the [g]overnment to produce an item that it needs," unlike Phillip Morris, which was simply conducting its operations in compliance with federal law. *Id.* In other words, "[t]he assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks." *Id.*

In *Watson,* the Court illustrated a sufficient special relationship with the facts in *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998), *overruled on other grounds by Latiolais*, 951 F.3d at 296. *Id.* at 153–54. *Winters* involved tort claims against Dow Chemical premised on the production of Agent Orange under a Department of Defense contract for use in the Vietnam War. 149 F.3d at 398. The Fifth Circuit determined that Dow satisfied the "acting under" element for federal officer removal based on "the government's detailed specifications concerning the make-up, packaging, and delivery of Agent Orange, the compulsion to provide the product to the government's specifications, and the on-going supervision the government exercised over the

14

formulation, packaging, and delivery of Agent Orange." *Id.* at 400. Dow "provid[ed] the [g]overnment with a product that it used to help conduct a war," and "at least arguably, . . . performed a job that, in the absence of a contract with a private firm, the [g]overnment itself would have had to perform." *Watson*, 551 U.S. at 154. As such, it had a "special relationship" with the government whereby it "help[ed] carry out[] the duties or tasks of the federal superior." *Id.* at 152, 157 (emphasis omitted); *see also Isaacson*, 517 F.3d at 137 (holding the "acting under" prong satisfied because Dow "received delegated authority" from the Pentagon "to provide a product [Agent Orange] that the [g]overnment was using during war" and that it would otherwise need to produce itself); *cf. Sawyer*, 860 F.3d at 255 (holding a private contractor "acted under" a federal superior by manufacturing boilers for use in U.S. Navy vessels).

Watson addressed one other "important" argument advanced in favor of § 1442 removal by a private corporation—that the FTC delegated testing authority to an industry-financed laboratory and that Philip Morris was "acting pursuant to that delegation." 551 U.S. at 153–54. The Court disagreed, finding "no evidence of any delegation of legal authority from the FTC to the industry association to undertake testing on the [g]overnment agency's behalf." *Id.* at 156. "Without evidence of some such special relationship, Philip Morris' analogy to [g]overnment contracting br[oke] down." *Id.* at 157.

This analysis of *Watson* and related caselaw indicates which types of contracts between federal superiors and private firms are special enough to satisfy the "acting under" prong for § 1442 removal. The private firm must go beyond mere compliance

with contractual terms, even if complex, and agree to help carry out the duties or tasks of the federal superior under that superior's strict guidance or control. And this closely supervised work must help federal officers fulfill basic government needs, accomplish key government tasks, or produce essential government products—that is, it must stand in for critical efforts the federal superior would need to undertake itself in the absence of a private contract. Wartime production is the paradigmatic example for this special relationship. Alternately, the "acted under" element may be established through the explicit contractual delegation of legal authority to act on the federal superior's behalf.

Here, Exxon's contractual relationship with the DOI does not meet these guidelines. By winning bids for leases to extract fossil fuels from federal land in exchange for royalty payments, Exxon is not assisting the government with essential duties or tasks. *See Baltimore II*, 952 F.3d at 465 (expressing skepticism "that the willingness to lease federal property or mineral rights to a private entity for the entity's own commercial purposes, without more, could ever be characterized as the type of assistance that is required to trigger the government-contractor analogy"). Critically, the leases do not obligate Exxon to make a product specially for the government's use, as in *Winters*, *Isaacson*, and *Sawyer*.

The government can (and does) purchase some of the fuel produced by Exxon via its OCS leases, as it does from others in the marketplace. But the OCS leases do not require Exxon to tailor fuel production to detailed government specifications aimed at satisfying pressing federal needs. *Compare Winters*, 149 F.3d at 399 (referencing precise government specifications for Agent Orange that "included use of the two active

16

chemicals in unprecedented quantities for the specific purpose of stripping" vegetation), *with Washington v. Monsanto Co.*, 738 F. App'x 554, 555 (9th Cir. 2018) (unpublished) (explaining the government's off-the-shelf purchase of a defendant's product does not show that the government "supervised [the defendant's] manufacture . . . or directed [the defendant] to produce [the product] in a particular manner, so as to come within the meaning of 'act[ed] under'" (quoting 28 U.S.C. § 1442(a)(1))). Nor do the leases obligate Exxon to perform services for the government.

Additionally, the OCS leases do not appear to contemplate the type of "close supervision of the private entity by the [g]overnment" needed to bring a government contractor relationship within the meaning of § 1442. *Isaacson*, 517 F.3d at 137. As the district court reasoned, "the government does not control the manner in which [Exxon] drill[s] for oil and gas, or develop[s] and produce[s] the product," nor has Exxon "shown that a federal officer instructed [it] how much fossil fuel to sell." App. at 242; *accord Baltimore II*, 952 F.3d at 466 (noting that "the leases do not appear to dictate that [the d]efendants extract fossil fuels in a particular manner," "vest the government with control over the composition of oil or gas to be refined and sold to third parties," or "affect the content or methods of [the d]efendants' communications with customers, consumers, and others about [the d]efendants' fossil-fuel products" (citations and quotation marks omitted)). Furthermore, many of the terms in the OCS leases "are mere iterations of the OCSLA's regulatory requirements," and compliance with such requirements, no matter their level of complexity, cannot by itself trigger the "acting under" relationship. *Baltimore II*, 952 F.3d at 465; *see also Watson*, 551 U.S. at 152.

17

The Energy Companies attack these conclusions by contending that "the operative leases explicitly afford the federal government the right to control the rates of mining and production." Appellants Br. at 40. The support for this argument comes from a provision in the 1979 lease, which states, "[a]fter due notice in writing, the Lessee shall drill such wells and produce at such rates as the Lessor may require in order that the leased area . . . may be properly and timely developed . . . ." App. 50 § 10. But there is also no allegation that the government ever actually directed Exxon's drilling activity or rates of production through its OCS land leases.

The same goes for the Energy Companies' citation to the government's wartime right of first refusal. Even if the exercise of these clauses would create the requisite level of federal supervision, the Energy Companies cite no authority for the proposition that the simple reservation of such rights by the government, without exercising those rights, places a contractor in the special relationship needed for a private firm to invoke the removal statute. *See Mays v. City of Flint*, 871 F.3d 437, 447 (6th Cir. 2017) (disagreeing with the "argument that this ability to intervene [by the federal government] supports the[] invocation of federal-officer removal" in the absence of actual intervention).

Last, Exxon cannot show the type of legal delegation that the *Watson* Court hypothesized would be sufficient to conclude a private corporation was "acting under" a government superior. None of the provisions of the OCS leases "establish the type of formal delegation that might authorize [defendants] to remove the case." *Watson*, 551 U.S. at 156. And "neither Congress nor federal agencies normally delegate legal authority to private entities without saying that they are doing so." *Id.* at 157.

Because Exxon has not established that it acted under a federal officer by complying with the terms of its OCS leases, we do not need to reach the remaining elements for federal officer removal. We hold that the Energy Companies have not established federal officer removal jurisdiction and affirm the district court on this removal ground.

## 2. 28 U.S.C. § 1441: Original Jurisdiction

The Energy Companies also contend that removal is available pursuant to 28 U.S.C. § 1441(a), the general removal statute, which allows for removal of "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." As relevant here, Congress has provided that federal "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. A defendant can remove an action provided at least one claim falls within original federal jurisdiction. 28 U.S.C. § 1367(a); *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 563 (2005).

On appeal, the Energy Companies claim federal jurisdiction exists under § 1441 and § 1331 on five separate grounds. First, they contend the Municipalities' claims arise under federal common law. Second, they claim federal jurisdiction exists because the CAA completely preempts the state-law claims. Third, the Energy Companies argue the Municipalities' claims necessarily raise substantial issues of federal policy. Fourth, they assert federal enclave jurisdiction. Fifth, they argue there is original federal jurisdiction under the OCSLA. We begin with an overview of the limitations of § 1331 jurisdiction,

19

then we discuss how those principles apply to each of the five grounds asserted for federal jurisdiction.

### a. 28 U.S.C. § 1331

Although § 1331 mirrors the "arising under" jurisdictional grant in Article III, statutory federal-question jurisdiction is interpreted more restrictively than its constitutional counterpart, which extends jurisdiction to all cases where a federal question is "'an ingredient'" of the action. *See Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 807 (1986) (quoting *Osborn v. Bank of the U.S.*, 22 U.S. 738, 823 (1824) (Marshall, C.J.)). "In exploring the outer reaches of § 1331," the Court has emphasized that "determinations about federal jurisdiction require sensitive judgments about congressional intent, judicial power, and the federal system." *Id.* at 810. And it has "forcefully reiterated" that this jurisdictional inquiry necessitates "prudence and restraint." *Id.*

### i. The well-pleaded complaint rule

The Supreme Court has cabined jurisdiction under § 1331 by application of the well-pleaded complaint rule, which provides "that the federal question must appear on the face of a well-pleaded complaint and may not enter in anticipation of a defense." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 494 (1983). As a result, the well-pleaded complaint rule is a "powerful doctrine" that "severely limits the number of cases in which state law 'creates the cause of action' that may be initiated in or removed to federal district court." *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 9–10 (1983).

The rule is premised on the notion that the plaintiff is the "master of the claim" and may "avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar*, 482 U.S. at 392. Under the well-pleaded complaint rule, it has long been held that a "plaintiff may by the allegations of his complaint determine the status with respect to removability." *Great N. Ry. Co. v. Alexander,* 246 U.S. 276, 282 (1918). And the defendant's assertion of a defense based on federal law does not transform claims based on state law into a removable federal question. *Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152–54 (1908). Indeed, a federal defense, including preemption, cannot support removal "even if the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the federal defense is the only question truly at issue in the case." *Franchise Tax Bd.*, 463 U.S. at 14.

"[F]ederal jurisdiction attaches when federal law creates the cause of action asserted." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 383 (2016). The creation test "accounts for the vast bulk of suits that arise under federal law." *Gunn*, 568 U.S. at 257. But there are two exceptions to the well-pleaded complaint rule: (1) the state-law claims are artfully pleaded/completely preempted by federal law and (2) the state-law claims necessarily raise a substantial, disputed federal question. *Devon Energy Prod. Co., L.P. v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1203–04 (10th Cir. 2012). Because the exceptions are relevant to this appeal, we describe them here.

ii.  Complete preemption/artful pleading exception

Complete preemption is a term of art for an exception (or an independent corollary) to the well-pleaded complaint rule. *Schmeling v. NORDAM*, 97 F.3d 1336,

1339 (10th Cir. 1996). Sometimes complete preemption is also known as artful pleading. "If a court concludes that a plaintiff has 'artfully pleaded' claims" by excluding necessary federal questions from the pleadings, "it may uphold removal even though no federal question appears on the face of the plaintiff's complaint." *Rivet v. Regions Bank of La.*, 522 U.S. 470, 475 (1998). The Supreme Court treats the "artful pleading" and "complete preemption" doctrines as indistinct. *See id.*[4] Thus, "[t]he artful pleading doctrine allows removal where federal law completely preempts an asserted state-law claim." *Id.*

Complete preemption applies when "the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Caterpillar*, 482 U.S. at 393 (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987)). When this happens, the state-law cause of action becomes "purely a creature of federal law, notwithstanding the fact that state law would provide a cause of action in the absence of" the federal law. *Franchise Tax Bd.*, 463 U.S. at 23. Upon the doctrine's proper invocation, "a complaint alleging only a state law cause of action may be removed to federal court on the theory that federal preemption makes the state law claim 'necessarily federal in character.'" *Schmeling*, 97 F.3d at 1339 (quoting *Metro. Life*, 481 U.S. at 63–64).

---

[4] "The absence from Justice Ginsburg's [*Rivet*] opinion of any reference to a category of artful pleading that is conceptually distinct from the complete preemption doctrine hints that completely preempted claims may be the only claims to which the artful-pleading doctrine should apply." 14C CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 3722.1 (Rev. 4th ed. 2021).

To determine whether a state-law claim is completely preempted by federal law, we apply a two-step analysis: "first, we ask whether the federal question at issue preempts the state law relied on by the plaintiff; and second, whether Congress intended to allow removal in such a case, as manifested by the provision of a federal cause of action." *Dutcher*, 733 F.3d at 985–86 (quotation marks omitted). Because the first prong implicates the merits of an ordinary preemption defense, which cannot support removal, the removal analysis begins with the second prong. *See Metro. Life*, 481 U.S. at 66 ("[T]he touchstone of the federal district court's removal jurisdiction is not the 'obviousness' of the pre-emption defense but the intent of Congress.").

A part of the congressional intent analysis is whether there is "a potential federal cause of action," the existence of which "is critical" because "complete preemption is not the same as preemption." *Dutcher*, 733 F.3d at 986. "That is, a state cause of action may not be viable because it is preempted by a federal law—but only if federal law provides its own cause of action does the case raise a federal question that can be heard in federal court." *Id.* To completely preempt, "the federal cause of action need not provide the same remedy as the state cause of action." *Schmeling*, 97 F.3d at 1343. However, "the federal remedy at issue must vindicate the same basic right or interest that would otherwise be vindicated under state law." *Devon Energy*, 693 F.3d at 1207.

"'Complete preemption is a rare doctrine.'" *Id.* at 1204 (quoting *Cmty. State Bank v. Strong*, 651 F.3d 1241, 1260 n.16 (11th Cir. 2011)). The Supreme Court has recognized it in just three statutory contexts: § 301 of the Labor Management Relations Act, § 502 of ERISA, and usury actions under the National Bank Act. *Devon Energy*, 693

23

F.3d at 1204–05. This circuit has also recognized the complete preemptive effect of the Securities Litigation Uniform Standards Act. *See Anderson v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 521 F.3d 1278, 1283–84 (10th Cir. 2008).

iii. Substantial federal-question jurisdiction (*Grable* jurisdiction)

The Supreme Court has instructed that "a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law." *Grable*, 545 U.S. at 312. This is true "[e]ven though state law creates [a plaintiff's] causes of action" because a "case might still 'arise under' the laws of the United States if a well-pleaded complaint established that its right to relief under state law requires resolution of a substantial question of federal law in dispute between the parties." *Franchise Tax Bd.*, 463 U.S. at 13. But this circumstance describes a "special and small category" of cases. *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 699 (2006).

A federal court can exercise federal-question jurisdiction over an action that pleads only state-law claims if those claims "require[] resolution of a substantial question of federal law in dispute between the parties." *Franchise Tax Bd.*, 463 U.S. at 13. The Supreme Court set out the standard for substantial question jurisdiction in *Grable*. The Court explained that the relevant question is, "does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314.

Like complete preemption, "[t]he 'substantial question' branch of federal question jurisdiction is exceedingly narrow." *Gilmore v. Weatherford*, 694 F.3d 1160, 1171 (10th Cir. 2012). It is not triggered by a "mere need to apply federal law in a state-law claim." *Grable*, 545 U.S. at 313. Nor can it be triggered solely by a federal defense, in keeping with the well-pleaded complaint rule. *Becker v. Ute Indian Tribe of the Uintah & Ouray Rsrv.*, 770 F.3d 944, 947 (10th Cir. 2014).

***

Having discussed the limits of § 1331 federal jurisdiction, we now turn to the Energy Companies' grounds for removal jurisdiction under § 1331: (1) the claims arise under federal common law, (2) the CAA completely preempts the claims, (3) the claims raise a substantial federal issue, (4) there is federal enclave jurisdiction, and (5) there is original jurisdiction under the OCSLA.

### b. Claims arise under federal common law

The Energy Companies argue there is federal-question jurisdiction over the Municipalities' state-law claims because they are governed by federal common law. The district court concluded federal common law did not create the cause of action because a federal common law claim was not alleged on the face of the Amended Complaint. Additionally, the district court determined that the federal common law did not completely preempt the state-law claims. The district court held that, at best, the argument that the Municipalities' "state law claims are governed by federal common law [would] be a matter of ordinary preemption," which is "a defense to the complaint, and does not render a state-law claim removable." App. at 215–16.

It is undisputed that the Municipalities did not explicitly allege a claim under federal common law in the Amended Complaint. But the Energy Companies contend the Municipalities drafted their Amended Complaint to conceal the federal character of their claims. We begin by considering whether federal common law governs claims related to climate change, as the Energy Companies contend. Then, we turn to the question of whether the federal common law creates the Municipalities' causes of action.

    i.   Relevant case law

"There is no federal general common law," *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), but there remain limited areas of "'specialized federal common law,'" *Am. Elec. Power Co., Inc. v. Connecticut (AEP)*, 564 U.S. 410, 421 (2011) (quoting Friendly, *In Praise of* Erie—*And of the New Federal Common Law*, 39 N.Y.U. L. REV. 383, 405 (1964)). "The cases in which federal courts may engage in common lawmaking are few and far between." *Rodriguez v. FDIC*, 140 S. Ct. 713, 716 (2020). Among them is when "a federal rule of decision is 'necessary to protect uniquely federal interests.'" *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 426 (1964)). The Energy Companies assert that the Municipalities' claims here are governed by the federal common law of transboundary pollution. Accordingly, we begin with a discussion of the primary caselaw on which the Energy Companies rely.

In *Illinois v. City of Milwaukee (Milwaukee I)*, 406 U.S. 91, 93 (1972), Illinois filed an original complaint in the Supreme Court on a theory of public nuisance against Milwaukee and several other Wisconsin cities for allegedly polluting Lake Michigan. The

26

Court first held that cases arising under federal common law fall under the ambit of

§ 1331. *Id.* at 100. While ultimately declining to exercise original jurisdiction over the

substantive claims, the Court stated, "there is a federal common law" concerning "air and

water in their ambient or interstate aspects." *Id.* at 103. In this area, "federal law

governs," and "state statutes or decisions are not conclusive." *Id.* at 105, 107. But the

Court projected "that new federal laws and new federal regulations may in time pre-empt

the field of federal common law of nuisance." *Id.* at 107.

In the 1970s, Congress passed major updates to the Clean Water Act. *City of

Milwaukee v. Illinois (Milwaukee II)*, 451 U.S. 304, 308 (1981). After these amendments,

Illinois and Michigan filed a separate suit in federal district court under federal common

law, seeking abatement of the public nuisance allegedly created by Lake Michigan

sewage discharges. *Id.* at 310. The district court resolved the action in Illinois's favor. *Id.*

at 312. The Seventh Circuit agreed that the federal common law of nuisance survived the

1972 amendments to the Water Pollution Control Act but held that courts should look to

the amendments' "'policies and principles for guidance.'" *Id.* at 312 (quoting *Illinois v.

City of Milwaukee*, 599 F.2d 151, 164 (7th Cir. 1979), *vacated & remanded by* 451 U.S.

304). The defendants appealed, and in *Milwaukee II*, the Court considered "the effect of

this legislation on the previously recognized cause of action." *Id.* at 308. As detailed

below, the Supreme Court disagreed about the effects of the amendments and vacated the

Seventh Circuit's decision.

The Court explained that in the absence of congressional action, "and when there

exists a 'significant conflict between some federal policy or interest and the use of state

27

law,' the Court has found it necessary, in a 'few and restricted' instances, to develop federal common law." *Id.* at 313 (first quoting *Wallis v. Pan Am. Petrol. Corp.*, 384 U.S. 63, 68 (1966); and then quoting *Wheeldin v. Wheeler*, 373 U.S. 647, 651 (1963)). This exercise is only "a 'necessary expedient,'" however, "and when Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of lawmaking by federal courts disappears." *Id.* at 314 (quoting *Comm. for Consideration of Jones Falls Sewage Sys. v. Train*, 539 F.2d 1006, 1008 (4th Cir. 1976)). The Court ruled that the "self-consciously comprehensive" water pollution amendments left "no room for courts to attempt to improve on that program with federal common law." *Id.* at 319.

In rejecting Illinois's argument that the Act's savings provision, § 510, preserved federal common law, the Court further stated,

> It is one thing . . . to say that States may adopt more stringent limitations through state administrative processes, *or even that States may establish such limitations through state nuisance law, and apply them to in-state discharges*. It is quite another to say that the States may call upon *federal* courts to employ *federal* common law to establish more stringent standards applicable to out-of-state dischargers.

*Id.* at 327–28 (first emphasis added). Thus, the amendments to the Clean Water Act displaced the federal common law for water-based transboundary pollution.

What *Milwaukee II* did to the federal common law of interstate water pollution, *AEP* did to the federal common law of interstate air pollution. In *AEP*, several states sued a few power companies and the Tennessee Valley Authority in federal court, asserting the companies' $CO_2$ emissions contributed to global warming and interfered with public

28

rights in violation of the federal common law of interstate nuisance, or, in the alternative, state tort law. 564 U.S. at 418. They sought injunctive relief in the form of emissions caps. *Id.* at 419. The Second Circuit held the plaintiffs had stated a claim under the "'federal common law of nuisance,'" but the Court reversed. *Id.* (quoting *Connecticut v. Am. Elec. Power Co., Inc.*, 582 F.3d 309, 358, 371 (2d Cir. 2009), *rev'd by* 564 U.S. 410).

The Court first noted the history of "federal common-law suits brought by one State to abate pollution emanating from another State," where "borrowing the law of a particular State would be inappropriate." *Id.* at 421–22. But it said determining whether "the plaintiffs could state a federal common-law claim for curtailment of greenhouse gas emissions because of their contribution to global warming" was now "an academic question," because "the [CAA] and the EPA actions it authorizes displace any federal common-law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired powerplants." *Id.* at 423–24.

In closing, the Court briefly addressed the plaintiffs' state-law nuisance claims. It first noted that if a case "should be resolved by reference to federal common law[,] . . . state common law [is] pre-empted." *Id.* at 429 (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 488 (1987)). Thus, due to the Court's "holding that the [CAA] displaces federal common law, the availability *vel non* of a state lawsuit depends, *inter alia*, on the preemptive effect of the federal Act." *Id.* (citing *Ouellette*'s "holding that the Clean Water Act does not preclude aggrieved individuals from bringing a 'nuisance claim pursuant to the law of the *source* State'" (quoting 479 U.S. at 497)). But because no party

29

briefed preemption or "the availability of a claim under state nuisance law," the Court left

the matter open. *Id.*

The Ninth Circuit applied *AEP* in *Native Village of Kivalina v. ExxonMobil Corp.*,

696 F.3d 849 (9th Cir. 2012). There, an Alaskan village sued various energy producers,

including Exxon, for climate change-related harms in federal district court, alleging

violation of the federal common law of nuisance. *Id.* at 854. Kivalina's claims were

slightly different than those of the *AEP* plaintiffs: it sought damages for harm caused by

past emissions rather than emissions abatement. *Id.* at 857. But "the type of remedy

asserted is not relevant to the applicability of the doctrine of displacement." *Id.* "When

Congress has acted to occupy the entire field"—as it did through the CAA in regard to

domestic greenhouse gas emissions—"that action displaces any previously available

federal common law action." *Id.* "Thus, *AEP* extinguished Kivalina's federal common

law public nuisance damage action, along with the federal common law public nuisance

abatement actions." *Id.* In other words, the federal common law of nuisance that formerly

governed transboundary pollution suits *no longer exists* due to Congress's displacement

of that law through the CAA.[5] "Simply put," this case could "not have been removed to

---

[5] Even if the pre-*AEP* federal common law of transboundary pollution remained viable, however, it is unclear whether our case is properly placed within that realm. In *AEP*, the Court recognized this "specialized federal common law" as applying to "suits brought by *one State* to abate pollution emanating from *another State*," and did not decide "whether private citizens . . . or political subdivisions . . . of a State may invoke the federal common law of nuisance to abate out-of-state pollution." *Am. Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410, 421–22 (2011) (emphasis added). Thus, it is an "open question" whether the Municipalities are "the type of part[ies] that can bring a federal common law nuisance claim." *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 866 (9th Cir. 2012) (Pro, J., concurring). It is also unsettled whether the federal

federal court on the basis of federal common law that no longer exists." *Cnty. of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934, 937 (N.D. Cal. 2018), *aff'd in part*, 960 F.3d 586 (9th Cir. 2020), *vacated on other grounds*, 141 S. Ct. 2666 (2021) (Mem.).

Kivalina also brought a state-law nuisance claim, which the district court dismissed without prejudice, and without being addressed by the Ninth Circuit majority. In a concurring opinion, Judge Pro stressed that Kivalina may have retained its causes of action under state law: "Once federal common law is displaced, state nuisance law becomes an available option to the extent it is not preempted by federal law." *Kivalina*, 696 F.3d at 866 (relying upon *AEP*'s statement that "the availability *vel non* of a state lawsuit depends, *inter alia*, on the preemptive effect of the federal Act" (quoting 564 U.S. at 429)). Judge Pro therefore concluded that "Kivalina may pursue whatever remedies it may have under state law to the extent their claims are not preempted." *Id.*

Thus, the question is whether the federal act that displaced the federal common law preempted the state-law claims. And because *ordinary* preemption can never serve as a basis for removal, a state lawsuit brought under state law in the transboundary pollution context could be removed by means of a federal question only through the doctrine of *complete* preemption.

---

common law of interstate pollution covers suits brought against product sellers rather than emitters—suits in which "out-of-state third-party emitters" are only "steps in the causal chain." Appellee Br. at 27. While several district courts have held it does, basing removal on an unsettled question of federal common law would cut against "the need for careful judgments about the exercise of federal judicial power in an area of uncertain jurisdiction." *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 814 (1986).

In sum, the Energy Companies' argument that the Municipalities' claims "arise under" federal common law fails because the reliance on only state-law claims leaves complete preemption as the sole path for federal removal jurisdiction. As instructed in *AEP* and supported by *Kivalina*, we look to the federal act that displaced the federal common law to determine whether the state claims are preempted. In this case, that would be the CAA. Before considering whether the CAA completely preempts the field, however, we pause to address the Energy Companies argument that the Municipalities artfully pleaded their state-law claims to avoid the federal nature of their federal common law claims.

ii.   Artful pleading/complete preemption

The Energy Companies assert that despite stating only state-law claims, it is nonetheless clear from the face of the complaint that "federal common law supplies the rule of decision for th[e]se claims." Appellants Br. at 26. For the reasons we now explain, we reject this argument.

While the Energy Companies assert their argument is "not merely a question of pleading," Reply Br. at 7, they essentially contend the Municipalities have engaged in "artful pleading" by attempting to conceal the federal character of their claims in state garb, *see* Appellants Br. at 26 (citing a portion of a district court opinion that references "artful pleading"); Reply Br. at 7–8 (quoting a section of Wright & Miller's treatise titled "Removal Based on Artful Pleading" for the proposition that "a plaintiff cannot 'block removal' by attempting to 'disguise [an] inherently federal cause of action'" (quoting 14C CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3722.1 (2d ed.

32

2019))). This reliance on the "artful pleading" exception to the well-pleaded complaint rule, however, is misplaced. For purposes of federal subject-matter jurisdiction, we look to the face of the complaint and assess whether the plaintiff has advanced a federal claim. *Verlinden*, 461 U.S. at 494. It is only when the merits of a defense based on "complete preemption" are considered that the court is free to look behind the plaintiff's chosen claims to determine whether federal law has completely preempted the area.

As noted, complete preemption requires congressional intent. S*ee Metro. Life*, 481 U.S. at 65–66. Because federal common law is created by the judiciary—not Congress—Congress has not "clearly manifested an intent" that the federal common law for transboundary pollution will completely preempt state law. *Id.* at 66. Therefore, the federal common law for transboundary pollution cannot *completely* preempt the Municipalities' state-law claims. *See Marcus v. AT&T Corp.*, 138 F.3d 46, 54 (2d Cir. 1998) (applying the same reasoning and holding that "federal common law does not completely preempt state law claims in the area of interstate telecommunications").

The importance of the procedural posture of the lawsuit for purposes of removal jurisdiction was recently emphasized by the Second Circuit in *City of New York v. Chevron Corp.,* 993 F.3d 81 (2d Cir. 2021). There, the city brought state nuisance claims against various multi-national oil companies, alleging the companies were liable for damages caused by global warming. *Id.* at 88. Importantly, the city initiated the action in federal court, and thus, the issues before the district court and the circuit were not within the context of removal. *Id.* Instead, the district court granted the oil companies' motions to dismiss the action under Federal Rule of Civil Procedure 12(b)(6) because the CAA

displaced the city's common law claims with respect to domestic emissions, and "judicial caution counseled against" entertaining the city's claims based on foreign greenhouse emissions. *Id.* at 88–89.

On appeal, the Second Circuit affirmed on the same grounds. *Id.* at 89–103. Importantly for our purposes, the circuit court acknowledged and explained the tension between its conclusion that federal common law displaced the city's state-law claims and the "parade of recent opinions holding that 'state-law claims for public nuisance brought against fossil-fuel producers do not arise under federal law.'" *Id.* at 93 (quoting *City of Oakland v. BP P.L.C.*, 960 F.3d 570, 575 (9th Cir. 2020), *amended & superseded on denial of reh'g*, 969 F.3d 895 (9th Cir. 2020)). The court explained that each of the decisions that concluded federal common law did not preempt the plaintiff's state-law claims had done so in different procedural context—removal. *Id.* Unlike in the removal context, the Second Circuit was permitted to consider the defendants' *ordinary* preemption defense when analyzing whether the city had failed to state a claim.

In the removal context, however, only *complete* preemption can support removal. And because the federal common law does not *completely* preempt state law, removal is not warranted under the artful pleading or complete preemption exception to the well-pleaded complaint rule. The Municipalities have pleaded only state-law causes of action. And at this stage of the proceedings, we do not look behind those allegations.[6]

---

[6] The Energy Companies raise an alternative basis for jurisdiction under the federal common law in their supplemental brief. First, they assert that "the Ninth Circuit erred by analyzing the federal-common-law argument under the *Grable* framework" in *City of Oakland v. BP PLC*, 969 F.3d 895, 906 (9th Cir. 2020), *cert. denied*, 141 S. Ct.

### c. CAA Complete Preemption

Having determined that the federal common law does not completely preempt the state-law claims, we now consider whether the federal act that displaced the federal common law—the CAA—completely preempts them. The district court held that it does not, reasoning that the CAA does not govern the sale of fossil fuels, and it "expressly preserves many state common law causes of action." App. at 228. "From this," the district court determined "Congress did not intend the [CAA] to provide exclusive remedies in these circumstances, or to be a basis for removal under the complete preemption doctrine." *Id.* The district court explained that the preemption argument based on emissions standards must "be resolved in connection with an ordinary preemption defense, a matter that does not give rise to federal jurisdiction." *Id.* at 232.

---

2776 (2021). Appellants Supp. Br. at 13. But they also say, "[e]ven if the Ninth Circuit were correct to invoke the *Grable* framework" in relation to the federal common law, it would support removal. *Id.* The Energy Companies did not raise this argument in their opening brief. They also failed to raise this argument in their Notice of Removal, and they do not argue that plain error would result if we did not reverse the district court on this ground. Thus, the Energy Companies waived this argument. *See Sawyers v. Norton*, 962 F.3d 1270, 1286 (10th Cir. 2020) ("Issues not raised in the opening brief are deemed abandoned or waived." (quotation marks omitted)); *United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019) ("When an appellant fails to preserve an issue and also fails to make a plain-error argument on appeal, we ordinarily deem the issue waived."). For this reason, we decline to consider *Grable* jurisdiction as it relates to the federal common law in this appeal. *See* 14C CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 3733 (Rev. 4th ed. 2021) (explaining "defendants may not add completely new grounds for removal . . . , and the court will not, on its own motion, retain jurisdiction on the basis of a ground that is present but that defendants have not relied upon" in their notice of removal).

The Energy Companies point to two provisions of the CAA they claim completely preempt the state-law claims. First, they highlight the CAA's citizen-suit provision authorizing private challenges to rulemakings, or the absence of such rulemakings, by the EPA. *See* 42 U.S.C. § 7604(a). Second, they rely on the CAA's "path for private parties to petition EPA to undertake new rulemakings, the response to which is reviewable in federal court." Appellants Br. at 35 (citing 42 U.S.C. § 7607(b)(1) and 5 U.S.C. § 553(e)). But neither provision establishes complete preemption.

The Energy Companies acknowledge complete preemption applies when "a federal statutory scheme 'provide[s] the *exclusive* cause of action for the claim asserted.'" Appellants Br. at 34 (quoting *Beneficial Nat'l Bank v. Anderson*, 539 U.S. at 8) (emphasis added). But the CAA does not provide an exclusive federal cause of action for suits against private polluters, nor does it completely displace all state law in that area. To the contrary, § 7604 says "[n]othing in this section shall restrict any right which any person . . . may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief." 42 U.S.C. § 7604(e). Indeed, we have recognized that "[t]he purpose of the [CAA] is to control and improve the nation's air quality *through a combination of state and federal regulation*." *Ariz. Pub. Serv. Co. v. EPA*, 562 F.3d 1116, 1118 (10th Cir. 2009) (emphasis added). In other words, the CAA is designed to provide a floor upon which state law can build, not a ceiling to stunt complementary state-law actions. *See* 42 U.S.C. § 7416 (stating nothing in the CAA "shall preclude or deny the right of any State or political subdivision thereof" to adopt an emissions standard or limitation more stringent than the federal version); *id.*

36

§ 7412(r)(11) (similar provision regarding "prevention of accidental releases"). "A statute that goes so far out of its way to preserve state prerogatives cannot be said to be an expression of Congress's 'extraordinary pre-emptive power' to convert state-law into federal-law claims." *Rhode Island v. Chevron Corp.*, 393 F. Supp. 3d 142, 150 (D.R.I. 2019) (quoting *Metro. Life*, 481 U.S. at 65).

Even setting aside this savings clause, § 7604(a) creates causes of action against private companies only in specified circumstances that are not present here. Section 7604(a)(1) allows a private action for the violation of a CAA emissions standard, a limitation established by the CAA, or the violation of an official order; § 7604(a)(2) allows a private action against the Administrator for failing to perform a nondiscretionary act or duty; and § 7604(a)(3) permits a private suit for the construction (or proposed construction) of an emitting facility without the required federal permit, or for the violation of the conditions of such a permit. The Municipalities' claims do not concern CAA emissions standards or limitations, government orders regarding those standards or limitations, or federal air pollution permits. Indeed, their suit is not brought against emitters. Rather, the Municipalities' claims are premised on the Energy Companies' activities of "knowingly producing, promoting, refining, marketing and selling a substantial amount of fossil fuels used at levels sufficient to alter the climate, and misrepresenting the dangers." App. at 173. Section 7604(a) expressly does not "vindicate the same basic right or interest" as the Municipalities' state-law claims, *Devon Energy*, 693 F.3d at 1207, and thus cannot completely preempt those claims.

The same is true with respect to § 7607(b)(1), which governs judicial review of administrative proceedings. This section lays out the procedure for filing in a federal court "[a] petition for review of action of the [EPA] Administrator" taken under the CAA. As such, it does not "vindicate the same basic right or interest" as the Municipalities' state-law claims, *Devon Energy*, 693 F.3d at 1207, nor do those claims "duplicate[], supplement[], or supplant[]" § 7607(b)(1), *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004). Indeed, § 7607(b)(1) does not allow for suits against private parties at all.

In *Devon Energy*, we held the availability of judicial review of federal administrative action does not displace comparable state-law claims against private parties. 693 F.3d at 1207. There, Devon, an oil and gas producer, mistakenly drilled a well at a location in New Mexico's "Potash Area"—a mineral-rich reserve managed by the federal Bureau of Land Management ("BLM")—without BLM permission. *Id.* at 1198. BLM subsequently reviewed and approved the placement of Devon's Apache Well. *Id.* at 1199. Mosaic, a potash mining company, claimed that Devon's initial mistaken placement of the Apache Well had wasted resources and caused Mosaic damage. *Id.* Unable to reach a settlement, Devon sued Mosaic in federal court, seeking "a declaratory judgment that federal law completely preempted Mosaic's anticipated state-law claims emanating from Devon's unauthorized drilling." *Id.* at 1198. Devon asserted that Mosaic's only available remedies were "the federal administrative and judicial remedies under the Administrative Procedure Act." *Id.* at 1200 (quotation marks omitted).

38

This court disagreed: "While Mosaic may have been able to appeal the BLM's approval of the Apache Well, the availability of an administrative remedy *against the BLM* has no bearing on whether Mosaic's state law claims *against Devon* have been completely supplanted by a private federal cause of action." *Id.* at 1207 (quotation marks omitted). Mosaic was not challenging federal agency action or inaction but rather those actions taken by the private party, Devon, that resulted in injury to Mosaic. "Thus, even if pursuing relief through the APA might ultimately have resulted in the Apache Well being plugged and abandoned, it would not have compensated Mosaic for any damages stemming from Devon's initial act of drilling at an unapproved well site." *Id.* As a result, the APA did not provide a federal cause of action comprehensive enough to *completely* preempt related state-law claims.

This logic bars § 7607(b)(1) from serving to completely preempt the Municipalities' state-law claims. Even if those claims could be characterized as challenges to the air quality and emissions standards covered by the CAA, the availability of an administrative remedy against EPA would have no bearing on whether the Municipalities' state-law claims against the Energy Companies are completely preempted by a private federal cause of action. And even if pursuing relief against EPA through § 7607(b)(1) might ultimately lead to lower emissions in Colorado, it would not compensate the Municipalities for damages stemming from the Energy Companies' allegedly tortious fossil-fuel activities, which is the compensation they seek in this suit.[7]

---

[7] Because neither of the CAA provisions highlighted by the Energy Companies "vindicate the same basic right or interest" as the Municipalities' state-law claims, *Devon*

The courts that have considered this question agree the CAA does not completely preempt this type of climate change action.[8] We agree with these well-reasoned decisions and affirm the district court's rejection of complete preemption by the CAA as a basis for federal jurisdiction.

### d. Substantial federal-question jurisdiction (Grable jurisdiction)

Next, the Energy Companies argue that the Municipalities' state-law claims necessarily raise disputed, substantial federal issues suitable for federal court resolution—both because the claims relate to the federal government's conduct of foreign affairs and because they "amount to a collateral attack on cost-benefit analyses committed to, and already performed by, the federal government." Appellants Br. at 28. The elements for substantial federal question—or *Grable*—jurisdiction are that the "federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and

---

*Energy Prod. Co., L.P. v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1207 (10th Cir. 2012), it is unnecessary to address the significance of the absence of any cause of action for damages in the CAA.

[8] *See City of Oakland v. BP PLC*, 969 F.3d at 907–08 (9th Cir. 2020) ("Thus, the [CAA] satisfies neither requirement for complete preemption."); *Rhode Island v. Chevron Corp.*, 393 F. Supp. 3d 142, 150 (D.R.I. 2019) ("[T]he CAA authorizes nothing like the State's claims, much less to the exclusion of those sounding in state law."); *Baltimore I*, 388 F. Supp. 3d at 562 (explaining "the absence of any indication that Congress intended for these causes of action in the CAA to be the exclusive remedy for injuries stemming from air pollution" is "[f]atal to defendants' argument"); *Cnty. of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934, 938 (N.D. Cal. 2018) ("[T]he [CAA] and the Clean Water Act both contain savings clauses that preserve state causes of action and suggest that Congress did not intend the federal causes of action under those statutes 'to be exclusive.'" (quoting *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 9 n.5 (2003))).

(4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258.

The district court rejected the Energy Companies' argument that the Municipalities' "claims necessarily depend on a resolution of a substantial question" of federal policy. App. at 217. It determined that the Energy Companies had not cited any binding foreign policies or explained how this case would interfere with the policies they did cite. The district court also held that the policies the Energy Companies cited failed to satisfy two of the four elements for *Grable* jurisdiction: they were neither "necessarily raised" nor "substantial." *Id.* at 219–25. As discussed below, we similarly conclude the federal issues asserted are neither necessary to the Municipalities' claims nor substantial to the federal system. As a result, this case does not fit within that "slim category" of state-law disputes that merit removal based on the presence of a substantial federal question. *Gunn*, 568 U.S. at 258.

i. Necessarily raised

"To determine whether an issue is 'necessarily' raised, the Supreme Court has focused on whether the issue is an 'essential element' of a plaintiff's claim." *Gilmore*, 694 F.3d at 1173 (quoting *Grable*, 545 U.S. at 315). For example, in *Grable*, the Court exerted federal-question jurisdiction over a state court action because the meaning of a federal statute "appear[ed] to be the only legal or factual issue contested." 545 U.S. at 315. Likewise, in *Smith v. Kansas City Title & Trust Co.*, "[t]he decision depend[ed] upon the determination of" "the constitutional validity of an act of Congress which [was] directly drawn in question," 255 U.S. 180, 201 (1921). And in *Merrill Lynch*, the Court

41

confirmed federal-question jurisdiction would lie over a state court action brought to enforce a federal duty "because the claim's very success depends on giving effect to a federal requirement." 578 U.S. at 384.

The Energy Companies contend that the Municipalities' suit "implicates federal issues" because it "interfere[s] with" the federal government's longstanding "policy of pursuing economic growth rather than imposing emissions limits under imbalanced international agreements." Appellants Br. at 29–30. The Energy Companies attempt to establish this specific foreign policy by citing multiple federal sources from different branches of government that span four decades and feature different levels of binding legal effect. *Id.* at 28–30 (citing remarks by Presidents Ford and Trump, an executive order from President Reagan, a Senate resolution responding to President Clinton's signing of the Kyoto Protocol, and several laws passed in the wake of that signing). Setting aside whether this asserted foreign policy can be pieced together from such a miscellaneous patchwork, the Energy Companies have not shown how the alleged foreign policy forms a necessary element of the Municipalities' claims.

The Energy Companies also argue that the Municipalities' nuisance claims necessarily raise a collateral attack on the federal government's "weighing of the costs and benefits of fossil-fuel production and use" and upset the "appropriate balance" regarding that delicate issue struck under federal administrative law. Appellants Br. at 30–31 (citing 42 U.S.C. § 13384, 43 C.F.R. § 3162.1(a), and Exec. Order No. 12,866 (1993)). This argument, however, also fails to show how these regulatory cost-benefit determinations are an essential element of the Municipalities' claims. As the district court

42

reasoned, the Municipalities "do not allege that any federal regulation or decision is unlawful, or a factor in their claims, nor are they asking the [c]ourt to consider whether the government's decisions to permit fossil fuel use and sale are appropriate." App. at 221. Rather, any implied conflict between the Municipalities' state-law claims and federal cost-benefit determinations speaks to a potential defense on the merits of those claims, specifically a preemption defense, rather than to the jurisdictional issue.

The Energy Companies argue the Municipalities "aim to achieve through state tort law what they could not achieve in the federal legislative and regulatory process—namely, a determination that [the Energy Companies'] activities are unreasonable." Appellants Br. at 31. But this is simply a description of our federalist system, not a reason to override state sovereignty. That state common law might provide redress for harm caused by certain private actors, and thereby create remedies unavailable to a plaintiff through the federal legislative or regulatory process, is entirely unremarkable. Allowing any mismatch in the priorities evinced through state and federal law to warrant removal, in the absence of a substantial federal issue necessarily raised in the complaint, would lead to a major diminution in the power of state courts to enforce their own laws. It would also deny a tenet of dual sovereignty—that state courts "have inherent authority, and are thus presumptively competent" to address federal issues, including federal defenses. *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990).[9]

---

[9] "And, of course, the absence of original jurisdiction does not mean that there is no federal forum in which a pre-emption defense may be heard. If the state courts reject a claim of federal preemption, that decision may ultimately be reviewed on appeal by this

43

The Municipalities assert state-law claims—for nuisance, trespass, unjust enrichment, civil conspiracy, and violation of Colorado's consumer protection law—based on the Energy Companies' knowing promotion and sale of fossil fuels at levels that allegedly caused damage in Colorado. Far from the situation where the meaning of federal law is "the *only* legal or factual issue contested," *Grable*, 545 U.S. at 315 (emphasis added), here *none* of the issues the Municipalities raise pertain to the meaning of these policy statements and federal regulations. The Municipalities can prevail on their claims without proving any issue of federal law because the success of those claims is grounded in traditional state-law causes of action and does not depend on any federal policy or regulation. And the decision in this suit does not "depend[] upon the determination of" any federal policy, order, or regulation that is "directly drawn in question." *Smith*, 255 U.S. at 201. If these federal issues are raised, it will be by the Energy Companies as potential defenses, which cannot create a basis for removal. *See Becker*, 770 F.3d at 947 (stating substantial question jurisdiction cannot depend solely on a federal defense).

To be sure, there is a federal interest in promoting energy development. The Energy Companies, however, have failed to establish that a federal issue is a necessary element of the Municipalities' state-law claims.

---

Court." *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 12 n.12 (1983).

ii. Substantial

Even if the Energy Companies have identified a federal issue that is a necessary

element of the Municipalities' claims, however, the Energy Companies would still have

to show that the federal issues are sufficiently substantial. The Supreme Court has applied

two tests to determine whether a federal issue is sufficiently substantial. As explained in

*Grable* and *Gunn*, courts should look to the importance of the issue to the federal system

to determine whether it is substantial. *Gunn*, 568 U.S. at 260; *Grable*, 545 U.S. at 310.

The Supreme Court suggested in *Merrell Dow* that courts should also consider whether

the relevant federal law provides a private right of action or preempts state causes of

action. *See* 478 U.S. at 812.[10] We consider each substantiality test in turn, ultimately

concluding the Energy Companies have failed to establish the federal issues are

sufficiently substantial under either test.

1) *Grable*/*Gunn* substantiality

To satisfy *Grable*'s "substantial" prong, "it is not enough that the federal issue be

significant to the particular parties in the immediate suit." *Gunn*, 568 U.S. at 260. "The

substantiality inquiry under *Grable* looks instead to the importance of the issue to the

---

[10] The Energy Companies cite a three-part test from *Nicodemus v. Union Pacific Corp.*, 440 F.3d 1227, 1236 (10th Cir. 2006), for when "[a] case should be dismissed for want of a substantial federal question." Appellants Br. at 32; Reply Br. at 15. We have since recognized that the "sweeping language" in *Nicodemus* "regarding substantiality . . . may no longer be good law" after the Supreme Court's decision in *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 690, 700 (2006). *Gilmore v. Weatherford*, 694 F.3d 1160, 1175 n.3 (10th Cir. 2012). As such, we do not apply the test in *Nicodemus* and instead rely on the substantiality tests applied by the Supreme Court.

federal system as a whole." *Id.*; *see Grable*, 545 U.S. at 310 (holding "that the *national interest* in providing a federal forum for federal tax litigation is sufficiently substantial to support the exercise of federal-question jurisdiction." (emphasis added)). Such importance to the system can be evaluated by assessing whether the federal issue "would be controlling in numerous other cases." *McVeigh*, 547 U.S. at 700. For example, "*Grable* presented a nearly 'pure issue of law,' one 'that could be settled once and for all and thereafter would govern numerous . . . cases." *Id.* (quoting R. Fallon, et al., HART & WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 65 (2005 Supp.)). In contrast, resolution of claims that are "fact-bound and situation-specific" would not have this precedential effect and would be insufficiently substantial. *Id.* at 701.

The important national interest test is not satisfied here. A prerequisite to establish a case as having importance "to the federal system as a whole" is to identify a concrete federal law or regulation that the case definitively implicates, which the Energy Companies have neglected to do. *Gunn*, 568 U.S. at 260. The Energy Companies broadly argue that this state suit "sits at the intersection of federal energy and environmental regulation and necessarily implicates foreign policy and national security." Appellants Br. at 32. But it is difficult to comprehend how the suit's resolution could have controlling effect across the federal system regarding any of these substantial issues when the Energy Companies fail to adequately tether their "national interest" argument to any specific federal law or laws.

It follows from this fundamental failure that this case, unlike *Grable*, does not present "a nearly 'pure issue of [federal] law'" for definitive resolution, *McVeigh*, 547

46

U.S. at 700, (quoting R. Fallon et al., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 65 (2005 Supp.)), or "a context-free inquiry into the meaning of a federal law," *Bennett*, 484 F.3d at 910. To the contrary, the resolution of the Municipalities' state-law claims promises to be "fact-bound"—because it is dependent on analyzing the fossil-fuel activities of the Energy Companies over a period of decades—and "situation-specific"—because it is dependent on establishing the damage to natural environment and property in Colorado due to climate change. *McVeigh*, 547 U.S. at 701. To the extent federal issues may be injected into the proceedings, it is nevertheless likely that state issues will still predominate because the Municipalities have pleaded only state-law claims. *See Bennett*, 484 F.3d at 910. Regardless, the injection of those federal issues would at most require "a fact-specific application of rules that come from both federal and state law." *Id*. Such a case fails the important national interest test for substantiality.

### 2) *Merrell Dow* substantiality

A federal issue may also be substantial when the relevant federal law provides a private right of action or preempts state remedies. *Grable*, 545 U.S. at 316 (citing *Merrell Dow*, 478 U.S. at 812). *Merrell Dow*'s analysis of § 1331 substantiality in the context of a state court tort suit is pertinent here.

In *Merrell Dow*, the plaintiffs sued a drug manufacturer in state court, alleging that use of Bendectin during pregnancy led to birth deformities. 478 U.S. at 805. Five of the six claims were common-law tort claims, and one claim alleged misbranding in violation of the Food, Drug, and Cosmetic Act ("FDCA"). *Id.* at 805–06. The complaint also

alleged that the defendant's promotion of the relevant drug violated the FDCA,
amounting to a rebuttable presumption of negligence, and that the defendant's FDCA
violations directly and proximately caused the injuries. *Id.* at 806. The defendant
removed the case based on this injection of federal law into the complaint, and the Sixth
Circuit upheld jurisdiction.

The Supreme Court reversed. It reasoned the FDCA provided no federal private
cause of action and the plaintiffs' tort cause of action was "a subject traditionally
relegated to state law." *Id.* at 810–11. "Given the significance of the assumed
congressional determination to preclude federal private remedies, the presence of the
federal issue as an element of the state tort is not the kind of adjudication for which
jurisdiction would serve congressional purposes and the federal system." *Id.* at 814. The
Court further explained that Congress's decision not to include a federal remedy for a
violation of the FDCA "is tantamount to a congressional conclusion that the presence of a
claimed violation of the statute as an element of a state cause of action is insufficiently
'substantial' to confer federal-question jurisdiction." *Id.*

The Court rejected the defendant's argument "that there is a powerful federal
interest in seeing that the federal statute is given uniform interpretations, and that federal
review is the best way of insuring such uniformity." *Id.* at 815. "To the extent that
petitioner is arguing that state use and interpretation of the FDCA pose a threat to the
order and stability of the FDCA regime," the Court determined that a preemption
defense, not an attempted removal under § 1331, was the defendant's proper recourse. *Id.*
at 816. And it also rejected the argument that "whether a particular claim arises under

48

federal law depends on the novelty of the federal issue." *Id.* at 817. It determined that this would lead to inconsistencies across the federal courts. *Id.*

The *Merrell Dow* opinion also included an important footnote that attempted to reconcile the seemingly conflicting holdings on § 1331 substantial question removal in *Smith*, 255 U.S. 180, and *Moore v. Chesapeake & Ohio Railway Co.*, 291 U.S. 205 (1934). *Id.* at 814 n.12. The Court saw the difference in results "as manifestations of the differences in the nature of the federal issues at stake." *Id.* In *Smith*, where the Court found federal jurisdiction, "the issue was the constitutionality of an important federal statute." *Id.* Conversely, in *Moore*, where the Court did not find federal jurisdiction, "the Court emphasized that the violation of the federal standard as an element of state tort recovery did not fundamentally change the state tort nature of the action." *Id.*

The *Grable* Court clarified that *Merrell Dow* did not create a bright-line rule prohibiting substantial-question jurisdiction from being premised on a federal statute that contained no private right of action. 545 U.S. at 317–18. *Grable* explained the import of *Merrell Dow*'s reasoning:

> The absence of any federal cause of action affected *Merrell Dow*'s result two ways. The Court saw the fact as worth some consideration in the assessment of substantiality. But its primary importance emerged when the Court treated the combination of no federal cause of action and no preemption of state remedies for misbranding as an important clue to Congress's conception of the scope of jurisdiction to be exercised under § 1331. The Court saw the missing cause of action not as a missing federal door key, always required, but as a missing welcome mat, required in the circumstances, when exercising federal jurisdiction over a state misbranding action would have attracted a horde of original filings and removal cases raising other state claims with embedded federal issues.

*Id.* at 318.

Here, none of the sources of federal law upon which the Energy Companies premise their attempted substantial-question removal contain a private cause of action, and none would be likely to preempt any of the Municipalities' state-law claims.[11] Absence of a congressionally crafted remedy, or of a single federal statute, regulation, or other law that speaks directly to the alleged important federal issues, reveals the absence of the "welcome mat" required for a federal court to confidently accept jurisdiction over these state-law tort claims. *Id.*

This case also falls within *Merrell Dow*'s conception of a federal interest not critical enough to trigger substantial-question jurisdiction because, as in *Moore*, whatever federal issues exist "d[o] not fundamentally change the state tort nature of the action." 478 U.S. at 814 n.12; *see Moore*, 291 U.S. at 216–17 (reasoning that the presence of a federal statute as an element of the state-law cause of action did not confer federal jurisdiction, because "'the right of the plaintiff to recover was left to be determined by the law of the state'" (quoting *Minneapolis, St. Paul & Sault Ste. Marie R. Co. v. Popplar*, 237 U.S. 369, 372 (1915))). Finally, *Merrell Dow* rejects the argument that uniformity of interpretation is a sufficient reason to demand a federal forum to protect the federal interest when a preemption defense can be ably pursued in the state court action.

---

[11] It is doubtful the federal provisions cited by the Energy Companies in their cost-benefit argument would preempt state law. Both 42 U.S.C. § 13384 and Exec. Order No. 12,866 impose only inter- and intra-branch directives, respectively. And 43 C.F.R. § 3162.1(a) simply requires federal oil and gas lessees to drill in a way that maximizes economic recovery and minimizes waste. The same is true of the cited laws relating to the Kyoto protocol. And the cited presidential statements and joint resolutions lack the power to preempt.

In summary, the standards set forth in *Grable*, *Gunn*, and *Merrell Dow* indicate that the Energy Companies' asserted federal interests are not substantial enough to support federal jurisdiction. Because these federal interests are neither "necessarily raised" nor sufficiently "substantial," we affirm the district court's rejection of this basis for removal.

e. *Federal enclave jurisdiction*

State-law "actions which arise from incidents occurring in federal enclaves may be removed to federal district court as a part of federal question jurisdiction." *Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998). The Energy Companies contend this doctrine allows for removal of the Municipalities' claims because the Amended Complaint alleges injuries within federal enclaves. Specifically, they point to allegations of an insect infestation across Rocky Mountain National Park, an increased flood risk to San Miguel River in Uncompahgre National Forest, and "heat waves, wildfires, droughts, and floods" in both locations. Appellants Br. at 44 (quoting App. at 73, 80, 111, 116, 127). The district court held federal enclave jurisdiction does not support removal because although injury may have occurred to those federal enclaves, "[t]he actual injury for which [the Municipalities] seek compensation is injury to 'their property' and 'their residents,' occurring 'within their respective jurisdictions'" and not within the federal enclaves. App. at 237 (quoting *id.* at 73, 75, 193). We agree.

As the Municipalities note, Uncompahgre National Forest is mentioned nowhere in the Amended Complaint. And San Miguel River is not a federal enclave. The river runs through southwest Colorado for approximately 81 miles. *San-Miguel River*,

51

AMERICAN RIVERS, https://www.americanrivers.org/river/san-miguel-river/ (last visited Jan. 1, 2022). The majority of that distance is outside Uncompahgre Forest's borders. The river crosses through the forest at only two brief junctures, each well under a mile. *See* San Miguel River, GOOGLE MAPS, http://www.google.com/maps/place/San+Miguel+River/ (last visited January 12, 2022). An increased flood risk to the San Miguel River thus cannot credibly be deemed an injury within a federal enclave.

It is true that the Amended Complaint references damage in Rocky Mountain National Park, but it does so only in passing, and not as the site of any injury that might trigger federal enclave jurisdiction. For example, the Amended Complaint alleges "more severe insect outbreaks" across Colorado resulting from climate change, as evidenced in part by a recent outbreak in Rocky Mountain National Park that "was the most severe ever seen" in the state. App. 116. As the district court reasoned, the insect outbreak in the national park is referenced only "to provide an example of the regional trends that have resulted from [the Energy Companies'] climate alteration," *id.* at 237, with the actual alleged injury being "the bark beetle epidemics seen *across Colorado*," *id.* 116 (emphasis added).

The Energy Companies also argue the allegation that climate change will bring "heat waves, wildfires, droughts, and floods to the State" is an allegation of injury to Rocky Mountain and Uncompahgre because those enclaves exist within Colorado. *Id.* at 73. This theory sweeps far too broadly. The doctrine of federal enclave jurisdiction generally requires "that *all* pertinent events t[ake] place on a federal enclave." *Rosseter v.*

*Indus. Light & Magic*, No. C 08-04545 WHA, 2009 WL 210452, at \*1 (N.D. Cal. Jan. 27, 2009) (emphasis added); *accord Mayor & City Council of Balt. v. BP, P.L.C. (Baltimore I)*, 388 F. Supp. 3d 538, 565 (D. Md. 2019) ("[C]ourts have only found that claims arise on federal enclaves, and thus fall within federal question jurisdiction, when all or most of the pertinent events occurred there." (collecting cases)). And even if we were to credit the Energy Companies' all-encompassing theory, the Municipalities expressly disclaimed any "damages or abatement relief for injuries to or occurring on federal lands." App. 195. Rather, they sought relief for only the negative "impacts within their respective jurisdictions." *Id.* at 73.

"That the alleged climate alteration by [the Energy Companies] may have caused similar injuries to federal property does not speak to the nature of [the Municipalities'] alleged injuries," which are all "alleged to have arisen exclusively on non-federal land." App. at 238. We agree with the district court that there is no viable claim of federal enclave jurisdiction and affirm its rejection of removal based on that doctrine.

### f. Outer Continental Shelf Lands Act

The Energy Companies assert federal jurisdiction exists under the OCSLA due to Exxon's decades-long OCS fossil-fuel operations pursuant to federal leases. The district court denied this argument, holding that "[a] case cannot be removed under OCSLA based on speculative impacts; immediate and physical impact is needed." App. at 248. Thus, the district court concluded, "[t]he fact that *some of* Exxon[]'s oil was apparently sourced from the OCS does not create the required direct connection." *Id.* at 246 (emphasis added). And it held the OCSLA was not grounds for federal jurisdiction.

The OCSLA provides that federal courts "shall have jurisdiction of cases and controversies arising out of, or in connection with . . . any operation conducted on the [OCS] which involves exploration, development, or production of [OCS] minerals." 43 U.S.C. § 1349(b)(1). To determine whether there is OCSLA jurisdiction, we consider "whether (1) the activities that caused the injury constituted an 'operation' 'conducted on the [OCS]' that involved the exploration and production of minerals, and (2) the case 'arises out of, or in connection with' the operation." *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014) (quoting 43 U.S.C. § 1349(b)(1)). The second prong of that test "require[s] only a but-for connection." *Id.* (internal quotation marks omitted).

The dispute here focuses on this second prong: whether the case arises out of or in connection with the OCS operation. Exxon argues this question should be answered in the affirmative because the Municipalities' claims "arise in part from [Exxon]'s operations on the [OCS]." Appellants Br. at 47. In response, the Municipalities argue OCSLA jurisdiction is founded on only "injuries arising *directly* out of physical activities on the OCS or disputes *directly* involving OCS activities." Appellee Br. at 52. We agree with the Municipalities.

The § 1349(b) jurisdictional test is designed to cover a "'wide range of activity occurring beyond the territorial waters of the states,'" *Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 213 (5th Cir. 2013) (quoting *Texaco Expl. & Prod., Inc. v. AmClyde Engineered Prods. Co.*, 448 F.3d 760, 768 (5th Cir. 2006), *amended on reh'g*, 453 F.3d 652 (5th Cir. 2006)), and to encompass "the entire range of legal disputes that [Congress] knew would arise relating to resource development on the [OCS]," *Laredo Offshore*

54

*Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1228 (5th Cir. 1985). But while "[u]se of the but-for test implies a broad jurisdictional grant under § 1349," *Tenn. Gas. Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996), its use "is not limitless" because a "blind application of this test would result in federal court jurisdiction over all state law claims even tangentially related to offshore oil production on the OCS," *Plains Gas Sols., LLC v. Tenn. Gas Pipeline Co.*, 46 F. Supp. 3d 701, 704–05 (S.D. Tex. 2014).

The district court similarly reasoned that a strict application of the but-for test would "dramatically expand the statute's scope," creating removal jurisdiction regarding "[a]ny spillage of oil or gasoline involving some fraction of OCS-sourced-oil" or "any commercial claim over such a[n OCS-sourced] commodity." App. at 247–48. The court concluded that § 1349 is not constructed so expansively in practice, and instead read OCSLA as requiring a case to "arise directly out of OCS operations." *Id.* at 245. Again, we agree with the district court's thoughtful analysis.

Indeed, caselaw bears out this interpretation. The decisions finding jurisdiction under § 1349 all involve a significantly more direct connection between OCS operations and the relevant lawsuit than that which exists here.[12] They each feature either claims

---

[12] *See In re Deepwater Horizon*, 745 F.3d 157, 161 (5th Cir. 2014) (removal jurisdiction over action for oil-spill damages to wildlife stemming from catastrophic blowout of OCS drilling rig); *Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 211 (5th Cir. 2013) (removal jurisdiction over claims stemming from accidental death of worker "on a jack-up rig attached to the [OCS]"); *Tenn. Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 152 (5th Cir. 1996) (removal jurisdiction over claims stemming from a vessel's collision "with a platform secured to the [OCS]"); *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1203, 1209 n.23 (5th Cir. 1988) (removal jurisdiction over dispute regarding take-or-pay obligations in contracts for the sale and purchase of natural gas extracted from OCS wells); *Ronquille v. Aminoil Inc.*, No. 14-164, 2014 WL

with a direct physical connection to an OCS operation (collision, death, personal injury, loss of wildlife, toxic exposure) or a contract or property dispute directly related to an OCS operation. *See, e.g.*, *Barker*, 713 F.3d at 213 ("By his own admission Barker's employment on the jack-up rig was directly related to the development of minerals or other natural resources on the OCS."); *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988) (stating that the contract rights at issue "necessarily and physically ha[d] an immediate bearing on the production of the particular [OCS oil] well," thus bringing the dispute within the "arising out of, or in connection with" language (quoting 43 U.S.C. § 1349(b)(1))). Despite the seemingly broad "but-for" test, courts "have made it clear that a dispute must have a sufficient nexus to an operation on the OCS to fall within the jurisdictional reach of the OCSLA." *Fairfield Indus., Inc. v. EP Energy E&P Co., L.P.*, No. H-12-2665, 2013 WL 12145968, at *4 (S.D. Tex. May 2, 2013) (collecting cases).

Here, there is not such a nexus between the dispute and Exxon's OCS operations. The Fifth Circuit has sanctioned OCSLA jurisdiction over disputes "one step removed

---

4387337, at *2 (E.D. La. Sept. 4, 2014) (removal jurisdiction over tort claims of plaintiff whose asbestos exposure arose at least in part from provision of "direct support for Shell Oil's rigs," including "the unloading and loading of barges, other boats, and trucks that transported equipment and pipe from OCS platforms"); *Oil Field Cases*, 673 F. Supp. 2d 358, 370 (E.D. Pa. 2009) (removal jurisdiction over claims "based on injuries sustained while working on oil rigs" that were attached to the OCS); *see also EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 565 (5th Cir. 1994) (original jurisdiction over suit filed to partition property located on the OCS); *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1225 (5th Cir. 1985) (original "jurisdiction over a contract dispute involving the construction of a stationary offshore platform on the [OCS]").

from the actual transfer of minerals to shore" such as "a contractual dispute over the control of an entity which operates a gas pipeline." *United Offshore Co. v. S. Deepwater Pipeline Co.*, 899 F.2d 405, 407 (5th Cir. 1990). But the relationship between Exxon's OCS operations and the Municipalities' claims is removed several steps beyond that. The Municipalities largely challenge the Energy Companies' sale and deceptive promotion of fossil fuels, activities that have no direct connection to Exxon's *production* of fossil fuels on the OCS. *See* App. at 147–72. To be sure, the Energy Companies characterize the Municipalities' claims as "targeting defendants' worldwide fossil-fuel business," which it contends "necessarily sweep in [Exxon's OCS] operations." Reply Br. at 25. Even under the broader scope of its global operations, however, the extent to which Exxon's OCS activities contributed to the downstream injuries alleged by the Municipalities in Colorado is too attenuated to sustain OCSLA removal jurisdiction where none of those Colorado-sited injuries are alleged to arise directly from OCS operations or OCS-extracted oil. As the district court noted, "jurisdiction under OCSLA makes little sense for injuries in a landlocked state that are alleged to be caused by conduct that is not specifically related to the OCS." App. at 247. Indeed, we have found no prior citations to 43 U.S.C. § 1349(b)(1) in any opinion from the fully landlocked Tenth Circuit.

The decision in *Parish of Plaquemines v. Total Petrochemical & Refining USA, Inc.*, 64 F. Supp. 3d 872, 898 (E.D. La. 2014), supports this conclusion. While that case dealt with the first prong of the Fifth Circuit's § 1349(b) test, its analysis is nonetheless pertinent here. In *Total Petrochemical*, a Louisiana parish sued various oil companies for engaging in unpermitted local operations that damaged parish land and waterbodies. *Id.* at

877–78. In seeking removal under § 1349(b), the defendants argued that "some of the complained-of activity . . . pertains to pipelines that carry oil and gas from the OCS to the [Parish], and that some of the facilities at issue in the [Parish] service oil and gas development on the OCS and co-mingle production with offshore sources." *Id.* at 894. The defendants claimed jurisdiction was proper "because [the] action 'involve[d]' operations on the OCS, and it therefore ar[o]se[] in connection with OCS operations." *Id.* at 896. The court rejected this argument, holding that "the relationship between the injuries in this case and the activities that cause[d] them and any operations on the OCS [was] simply too remote and attenuated." *Id.* at 898. Just as "the 'mere connection' between the claims asserted and an OCS operation [was] 'too remote' to establish federal jurisdiction" in *Total Petrochemical*, *id.*, it is likewise too remote to establish federal jurisdiction here.

Even under the technical reading of the Fifth Circuit's jurisdictional test advocated by Exxon, there is no indication that Exxon's OCS operations were a pure "but-for" cause of the Municipalities' claims. None of the Energy Companies offer any basis to conclude that absent the OCS activities the injuries complained of would not have occurred. Accordingly, the OCS activities are not the "but-for" cause of the Municipalities' injuries.

As the *Baltimore I* court reasoned, "[the d]efendants were not sued merely for producing fossil fuel products, let alone for merely producing them on the OCS." 388 F. Supp. 3d at 566. "Rather, the City's claims are based on a broad array of conduct, including [the] defendants' failure to warn consumers and the public of the known

58

dangers associated with fossil fuel products, all of which occurred globally." *Id.*

Consequently, the Municipalities' Colorado-based injuries and attendant state-law claims

could have arisen even if whatever slice of Exxon's fossil-fuel production attributable to

its operations on the OCS was removed from consideration. This failure to establish

"but-for" causation leaves the Energy Companies' jurisdictional burden of proof

unsatisfied.

Finally, the Energy Companies argue that the statutory purpose of OCSLA's

jurisdictional grant would be frustrated if this suit is not heard in federal court because an

award of the billions of dollars in damages sought by the Municipalities "would

substantially discourage production on the [OCS] and would jeopardize the future

viability of the federal [OCS] leasing program." Appellants Br. at 47–48. But it is

difficult to see how such a prospective theory of negative economic incentives—flowing

from a lawsuit that does not directly attack OCS exploration, resource development, or

leases—is anything other than contingent and speculative. And, as the district court

noted, "[a] case cannot be removed under OCSLA based on speculative impacts;

immediate and physical impact is needed." App. at 248; *cf. Texas v. United States*, 523

U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon 'contingent

future events that may not occur as anticipated, or indeed may not occur at all.'" (quoting

*Thomas v. Union Carbide Agricultural Prods. Co.*, 473 U.S. 568, 580–81 (1985))).

The defendants in *Total Petrochemical* made a similar policy argument,

contending that the imposition of state court liability based on injuries to the land and

waterbodies of a Louisiana parish would "have a significant adverse impact on oil and

gas production on the OCS because the OCS and onshore oil and gas systems do not operate independently but rather extensively overlap and share infrastructure." 64 F. Supp. 3d at 894. The district court found that the state court lawsuit *could* negatively impact the defendants' OCS operations but held that such impact was too speculative to support jurisdiction. *Id.* at 897–98. The same logic applies here. The chain of contingencies that connects the initiation of this case in state court to an eventual "impair[ment of] the total recovery of the federally[] owned materials from the" OCS is too uncertain, speculative, and hypothetical to serve as a jurisdictional hook. *Amoco Prod.*, 844 F.2d at 1210. Thus, we affirm the district court's rejection of OCSLA's jurisdictional provision as a basis for federal subject-matter jurisdiction over the Municipalities' claims.

### III.    CONCLUSION

For the reasons explained, we hold that none of the six grounds the Energy Companies assert for removal on appeal are sufficient to establish federal jurisdiction over the Municipalities' state-law claims. We therefore AFFIRM the district court's order remanding the action to the state court.